Filed 4/30/21  P. v. Saechao CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVID SOUWANG SAECHAO,<br><br>Defendant and Appellant. | C084561<br><br>(Super. Ct. No. 16FE015405) |

Following a jury trial, defendant David Souwang Saechao was convicted of assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)),[1] assault with a deadly weapon, a knife, with a gang enhancement (§§ 245, subd. (a)(1), 186.22, subd. (b)(1)), and dissuading a victim or witness from testifying (§ 136.1, subd.

---

[1]     Undesignated statutory references are to the Penal Code.

1

(c)(1)).  The trial court sustained a prior prison term allegation (§ 667.5, subd. (b)), and sentenced defendant to a 13-year state prison term.

On appeal, defendant contends admitting evidence of a driveby shooting by a third party was an abuse of discretion that violated his due process rights, and it was prejudicial error to allow the gang expert to offer his personal opinion as to whether crimes were committed for the benefit of the gang.  In a supplemental brief, he contends the prison prior should be stricken in light of Senate Bill No. 136.  We shall strike the prison prior and affirm.

BACKGROUND

*December 2015 Altercation*

L.S. is defendant's cousin.  Defendant was dating L.S.'s good friend Aaleshea Jimenez in December 2015.  L.S. never dated Jimenez but they talked with each other all the time.  Defendant was jealous of their relationship.

One time, an angry defendant got on the phone during a conversation between L.S. and Jimenez.  L.S., who was drunk and did not remember what defendant said, got angry because defendant raised his voice at him, which was reminiscent of an incident with defendant a year or two earlier.  When Jimenez got back on the phone, L.S. told her to pick him up and drive him to defendant's residence.  L.S. immediately got into a fistfight with defendant upon arriving at his house.  Defendant's father, Yoon Saechao,[2] separated them a few times, but defendant and L.S. would resume the fight.  L.S. testified that he fell on something sharp and injured his back during the fight.  He never saw a knife during the fight, but someone told him a knife was used.  In an interview with a prosecutor and a police detective, L.S. said defendant obtained a knife sometime after their second fight was broken up.  L.S. ran away and defendant slashed him in the back.

---

[2]     As many witnesses have the same last name, subsequent references are by their first names to avoid confusion and repetition.

2

Yoon testified it was dark and he did not recall if anyone grabbed a knife during the fight. He told a police officer that he had told L.S. to watch out because defendant had a knife.

Jimenez testified to telling Yoon to separate defendant and L.S. She did not see a knife during the fight, but told an officer defendant stabbed L.S. in the back and she had fought him for the knife. She also told the officer that soon after the fight, she broke up with defendant because she did not want to be involved in his activities.

*July 5, 2016 Assault*

Prior to her death in June 2016, defendant and L.S.'s grandmother lived in a house with Yoon, Yoon's wife, and defendant. The funeral took place at the home over several days. Defendant and L.S. did not fight during this time.

Defendant's family held a barbecue at the home on July 4, 2016. Among the 20 to 40 attendees were defendant, L.S., L.S.'s sister M.S., and some of defendant's friends. Sometime after midnight, L.S. left the party and went to a casino with defendant's brother, Lo Saechao, and sister, Ann Saechao. Defendant and his friends were also at the casino. Defendant and L.S. avoided each other at the casino. After a short time, L.S. and his party left the casino and went back to the house to continue drinking. Defendant and his friends went home around this time as well.

According to L.S., once he and defendant's siblings (his cousins) got to the house, they stayed in the front and drank. L.S. was hit on the head while he was talking to Lo. He assumed defendant hit him, but he did not see who did it. Someone told L.S. he had been hit by a bottle. L.S. also heard that he had been repeatedly kicked and stomped on, stabbed in the right forearm, and that a semiautomatic gun was used in the attack.

Officer Jyotis Hasegawa first interviewed L.S. about the attack on July 5. M.S. had picked up L.S. from the hospital and took him to the home where she lived with L.S., her boyfriend Jairo Vera, their two-year-old son, another brother of M.S. and that brother's family. L.S. told the officer he was jumped by two Asian males associated with

3

the Kim Zing Tong (KZT) gang in the Lemon Hill/Elder Creek area. He had been hit in the face with a glass bottle, repeatedly stomped and kicked while he was on the ground, and stabbed in the right arm with a knife. L.S. feared retaliation and did not want to file a police report. As Officer Hasegawa spoke to L.S., a black Acura sedan pulled up slowly in front of the house, turned the corner, and stopped for about 30 seconds. Officer Hasegawa could not identify the driver before the car slowly drove away.[3]

In a July 9 interview with Officer Hasegawa, L.S. said that Lo, Ann, and codefendant Anthony Hun were among the six or so people who were at the house when he was attacked. Defendant hit him with a glass bottle "out of nowhere." L.S. did not immediately fall down when defendant first hit him, but fell after defendant struck him with the bottle again. Defendant said something like, "Where's my $10,000," and also pulled out a gun and fired it in the air. Defendant next pointed the gun at those trying to break up the fight and said, "You guys better not get in the way." Hun and defendant kept kicking him, and defendant told Hun to cut off his finger. Hun grabbed a 10-inch knife and stabbed L.S. in the right arm. Ann got between them and told L.S. to run away.

In a December 2016 interview with the prosecutor and an investigator, L.S. said he did not know if the knife Hun grabbed was 10 inches. L.S. borrowed money from defendant before, and defendant also borrowed from him. Defendant had brought up some "money issue" with others and wanted L.S. to pay him. This is the only reason L.S. could understand why defendant fought him. The fight took place after they got back from the casino, when defendant came from out of nowhere and struck him above the left eye with a liquor bottle. Trying to get away, he stumbled and got hit on the head again. He chipped a tooth as defendant and Hun kicked him. Hun had a knife and defendant had a gun during the attack. Ann and Lo both tried to break up the fight; defendant flashed

---

[3]     Defendant's sister Ann had owned a black Acura that was seen parked in front of the home.

4

his gun and told them not to get involved. He was able to run away when Ann shielded him. He did not owe defendant money, but supposedly owed money to a friend of defendant's, but that was a long time ago.

According to defendant's brother Lo, the fight started about 15 minutes after they got back from the casino, with L.S. throwing the first punch. The fight never escalated beyond fists. Lo pulled defendant away and tried to calm him down after L.S. went to the ground. He never saw a gun or heard a gunshot. The fight should be resolved by the family.

Yoon testified he was in the backyard when he heard fighting. He went into the front yard and saw Lo holding defendant away from L.S. Yoon and his wife also held defendant back from L.S. Defendant was angry and wanted to attack. There was blood on L.S.'s arm, face, and back. He saw bloody broken green glass on the ground.

Yoon told Officer Hasegawa he was in the backyard when he heard the fight break out. He heard a loud bang like a firecracker or gunshot coming from the front of the house.

At 11:08 a.m. on July 5, Chai Saechao, an associate with KZT texted defendant, "Dam, what happened?" Defendant replied, "Long/short, my bro Lo n my sister got in the way." Chai responded, "WTF . . . you almost ran them over?" Defendant called Chai at 11:14 a.m. Around 11 minutes later, he texted defendant, "Fuck. Got to go lecture David before I go to work. Drama last night, I guess." Defendant texted back, "Ha, ha, text the wrong person cause I am David." Chai texted defendant, "LOL," and then, "Well that's what Imma do. Go lecture your ass before you go to jail." Chai also texted to defendant, "Not trying to see you go in," to which defendant replied, "Yeah."

Codefendant Anthony Hun called defendant at 8:10 p.m., 10:56 p.m., and 11:45 p.m. on July 4, and at 12:37 a.m., 12:51 a.m., and 1:12 a.m. on July 5. Defendant called Hun at 2:32 a.m. and 11:30 a.m. on July 5. At 12:04 p.m. Chai texted defendant,

5

"Outside. At 12:20 p.m., Hun texted defendant, "On my way." Hun called defendant at 12:46 p.m., and then texted, "I'm outside" to defendant.

*Threats Against M.S.*

Defendant called M.S. in the afternoon on July 6. He asked if everyone was home and told M.S. he would be coming over. Defendant specifically asked if L.S. was home; M.S. told defendant L.S. was not there. When defendant asked M.S. if she had called the police, she told him no. Defendant told M.S. he did not want to go back to prison, telling her something like he was "going to go out with a bang." M.S. testified that she did not take this seriously.

In a 911 call made after defendant's call, M.S. told the operator she was reporting a "threat." M.S. said her cousin "ran up to [her] little brother and like hit him over the head. And then his friends stabbed him." After the police came to her house, her cousin said he was "going to do life but he's just, he's gonna come over here and uh, go out with a bang and kill my whole family." M.S. told the operator she believed this was a credible threat because he used a gun on her brother and stabbed him. She also said that he had recently threatened her brother's family and now called her, threatening to go out with a bang. Her brother had been stabbed and hit in the head with a liquor bottle, but no one reported the attack because "everybody was scared." When asked if her cousin owned any weapons, M.S. replied, "I'm sure because he pulled out a weapon out that night." M.S. told the operator she was scared to stay in the house and was parked down the street from her home. She did not want to stay in the house "in case he even comes and does a drive by or anything."

M.S. testified she was nervous and scared when she called 911, but defendant did not threaten to kill her family. She called 911 because L.S. was at her house, no one else was at home, and she was "kind of nervous and scared." M.S. was "kind of" concerned about defendant doing something, but was primarily concerned about Hun, the one she heard was doing everything.

6

As she waited in the car for the police to arrive, a black Acura stopped next to M.S.'s car in the opposite direction. Hun was the driver, with defendant in the front passenger seat. When defendant walked up and said he wanted to talk to her, M.S. drove away because Hun was in the car.

Defendant and M.S. exchanged text messages the same day he called her. Defendant texted M.S. that he had been "so nice to y'all. Family, every one of y'all owe me money. I help y'all make money to pay me back and that nigga I help him make a thousand and he didn't want to give me shit. Now I'm not going to help nobody but myself when I need it I'm going to get it." M.S. replied by texting she gave Jimenez $500 to give to him, telling defendant she tried to pay him when she had money.[4]

In a text referring to defendant's call earlier that day, M.S. wrote: "And why would I want to talk when you said you coming over so you can go out with a bang since you think we called the cops which we didn't at all. It's not funny but scary when you tell me you sick of all this and asked if my whole family is home and if you going to do life, then you going out with a bang. That's scary shit." She also texted defendant, "Yes, we family but money issue can always be resolved. But when you cracked someone's head opened and have someone else slashed him, that's way overboard."

M.S. also texted defendant that he had been friends with L.S., and L.S. "didn't have a job, and sooner or later he would have to pay you." Defendant replied, "It's just business. You can't go around do people wrong and . . . expect every[body] to be cool." Defendant texted he "gave him 1000 and ask him to give me two back. And he pay another person in front of me when he been owe me." Defendant also texted that he was "at 10 percent and I'm selling his debt to the collector." M.S. replied, "After first time

---

[4]     M.S. testified she had borrowed money from defendant because "we go to casinos a lot."

7

[L.S.] went to your house and you guys fought, then you slashed him and he didn't even say anything. You should have let him be and have him pay you later."

M.S. was interviewed by Officer Hasegawa on July 9, and told him defendant called her on July 6 and said, "Is your family home? You guys call the cops on me? Well, then let's do this shit. I ain't going to go to prison. If I'm going to prison, I'm going to your house and do this shit. I'm going out with a bang. That mother fucker deserved to get stabbed." She believed this was a threat to kill her and her family. She related that after calling 911 and waiting in her car, defendant and Hun drove up to her in a black Acura. She sped away because she was afraid. M.S. said she and her family were "terrified."

In a December 2016 interview with the prosecutor and investigator, M.S. said she sat outside in her car after reporting the threat. When defendant called her, he did not say "that mother fucker deserved to get stabbed," instead, saying something like, "he deserved it or something."

*The Driveby Shooting*

On the night of February 17, 2017, M.S.'s boyfriend J.V. was sitting with his son in his car when a Trans Am or Honda drove down the street, turned off its headlights, and stopped in front of their house. J.V. remained in his car until the other vehicle drove away, and then went inside the house with his son. About 10 minutes later, J.V. heard a "clack, clack, clack" sound. He and his son were in the front bedroom, while M.S. was in the shower. Police found four bullet holes in the house's front; two of the bullets went into a bedroom.

Following the shooting, J.V., M.S., and their son went into witness protection. According to J.V. and M.S., L.S. went with them, but L.S. testified that he kept living in the house. L.S. assumed Hun committed the driveby shooting.

8

Police were still investigating the shooting at the time of the trial. Following the shooting, L.S. met with the prosecutor and investigator and then fled to Oregon, staying there for two weeks as the trial got underway. He left California out of fear of getting in trouble for telling them what he heard rather than what he saw. He did not want to put someone in jail for something he did not see.

*Gang Expert Testimony*

Officer Hasegawa testified as an expert in Asian gangs, and specifically the KZT gang.

In English, Kum Zing Tong means the Golden Eagle Association and KZT's symbol is an eagle. The gang started in 1998 or 1999 and has at least 75 members. Their primary territory was in the Lemon Hill Avenue/Elder Creek Road area of southern Sacramento.

KZT members wear American Eagle clothing as well as anything with a Z in its name. Gang members commonly wear eagle and the letter Z tattoos; KZT members often get dragon or tiger tattoos as part of Asian gang culture. The primary activities of KZT are attempted homicide, possession of marijuana for sale, possession of dangerous drugs for sale, and the cultivation and sale of marijuana.

K.S., a member of the Hop Sing gang, went into business in KZT and Viet Pride territory on January 12, 2012. KZT and Viet Pride got along at the time; Hop Sing is a common enemy of both gangs. As a result, two Viet Pride members confronted K.S. and challenged him to come outside and fight. As K.S. waited inside the business, KZT gang leader Roderick Randall went in and told K.S. to go out and fight. A fight started after other Hop Sing members arrived; Randall then ordered two KZT members to fire their guns at Hop Sing members. A Hop Sing member was shot in the back and another in the head. Randall was convicted of two counts of attempted murder. The crimes were committed for KZT's benefit.

A November 7, 2014 search of a house on Acton Way found three KZT members. Inside the house, officers found a loaded firearm and about 118 pounds of marijuana. Five women had been hired by KZT to process the marijuana for sale. M.S. was one of the women. One of the gang members was convicted of possession of marijuana for sale.

On July 8, 2015, officers searched a house on Turbot Court where defendant, a member of Viet Pride named Timmie Truong, and two other people were found. Pieces of mail addressed to defendant at that address were found at the house. The search discovered processed marijuana, packaged marijuana, marijuana plants, pay/owe sheets, two firearms, and methamphetamine. Defendant was convicted of possession of methamphetamine for sale.

Gang members commit crimes with other gang members for the support provided. They commit acts of violence to enhance their reputation, and create fear in the community as a means of enhancing other criminal activities. A member can move up the KZT hierarchy by committing crimes that enhance the gang's reputation or provide income for the gang. A younger gang member must act on the orders of an older member or face discipline.

Defendant and Hun were active KZT members on July 4, 2016. Officer Hasegawa opined that defendant assaulted L.S. on July 5 and then threatened M.S. and her family for the benefit of KZT.

DISCUSSION

I

Defendant contends the trial court abused its discretion and denied him the right to a fair trial by admitting evidence of the driveby shooting.

A.

On the day before opening argument, the prosecutor informed the trial court there was a driveby shooting at M.S. and L.S.'s house. L.S. and a roommate were at the house when the shooting happened, but the prosecutor did not know if M.S. was there. The

10

shooter's identity was not known, and no evidence linked defendant to the shooting. L.S. believed the shooting was tied to his testimony in the case. The prosecutor moved to admit the evidence as relevant to the credibility of M.S. and L.S., to show M.S. reasonably sustained fear from defendant's threat, and to support the expert's opinion that the conduct in this case was gang related. The defense objected, asserting the risk of prejudice too great as the jury would automatically connect the shooting to defendant even though there was no evidence connecting him to it.

The trial court indicated its intention to admit the evidence for the purposes listed by the prosecutor. Before the witness testified, the court would admonish the jurors that they could consider the driveby shooting only "as it relates to the witness's credibility and evaluate what impact this has on the credibility of this witness. You are not to consider this evidence against the defendant in any way."

During opening argument, the prosecutor began by stating: "Imagine, someone's at home. It's a Friday night. Just like any other Friday night. You're at home, it's 8:00 p.m. at night. They decide to take a shower. And all of a sudden, pop, pop, pop, a drive-by shooting. Happens. Four bullets fired at a house. They go into the house through the window. That's what this case is about. [¶] Now the judge is going to give you specific instructions on how you're allowed to use the drive by shooting evidence. But to be clear, this case is about a gang, about gang violence and one particular gang in question KZT."

Later, the prosecutor argued: "And, ladies and gentlemen, you'll also hear that a mere five days ago, five days ago from today, victims and witnesses were sitting at their house. And they will tell you they were scared, they were anxious about coming to court, about having to testify against the defendant, their own family member but a gangster. And as they sat there scared and anxious, shots went off, shots were fired at their house. Not one, not two, not three but four shots were fired at [M.S.] and [L.S.'s] house only

11

five days ago. Those bullets went through the house, went through the windows. Luckily no one was hit.

"And these witnesses are sitting down there scared and they already have the mind set, the defendant told [M.S.] he was going out with a bang. And you'll see as you hear the evidence, you'll hear from [M.S.] today, she will walk through the door later this morning and she's going to tell you what happened. She's going to be scared. She does not want to testify.

"But we will hear in this case in evidence that this is how gangs operate. They use fear, they use intimidation. This is how Mr. Saechao operates. He lived his life since at least 2002 as a gang member. This is his life. This is what his life is about."

Following the opening statement, the trial court instructed the jury it could consider evidence of the driveby shooting for the limited purpose of witness credibility, and "you cannot use it against the defendant in any way." Defense counsel objected and moved for a mistrial, asserting the opening statement violated the court's ruling that admitted the driveby shooting evidence for the limited purpose of witness credibility. The trial court denied the motion, finding the opening statement did not "strictly violate" the court's evidentiary ruling as the prosecutor informed the jury that the trial court would tell the jury how to use the driveby shooting evidence.

The trial court began its instructions to the jury by reiterating that it allowed the evidence of the driveby shooting "for the sole purpose of your being able to judge his credibility and motivation while serving as a witness. You are not to consider it for anything else, and you are not able to use it against the defendant in any way. It is solely for your determination of his credibility as a witness. [¶] You had heard some testimony at the beginning of the trial and then towards the end of the trial on that topic, and it goes to the witness's credibility and the motivation he might have for saying one thing or another."

12

During closing argument, the prosecutor argued:

"And then we saw the fear. We saw the fear first on [M.S.] and then on [L.S.] These are the ones—they're the ones who have actually had to testify. They had to give a statement to an officer saying what this gang member did, their own cousin.

"And then as they—on the eve of trial, as they're about to testify, as jury selection is going on, four bullets come into a house, where [L.S.'s] four-year-old son is playing video games, where [M.S.] is taking a shower. These four—a drive-by happens. Four bullets go into a house, and then [M.S.] and [L.S.] have to go into witness protection.

"And on the eve of their testimony, after [L.S.] has already given statements to Officer Hasegawa—he gave a statement to myself and Investigator Wagstaff—right before he's about to testify, days after the drive-by shooting, he runs. He goes to Oregon. And he is in Oregon for a couple weeks. And the only reason we saw him on the stand yesterday is because we found him, we arrested him and we brought him down here.

"And then once [L.S.] is on the stand, in the same room as David Saechao, what does he do? He lies to protect his family. Because he's scared. Because of the fear that David Saechao and KZT use.

"Violence, intimidation, and fear. This is the business model for KZT. This is what David Saechao has done. And as we've seen in this trial, these are his tools." The defense did not object to this argument.

B.

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest

13

miscarriage of justice.  [Citations.]'  [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

Evidence of fear induced by a third party against a witness is admissible in a criminal case.

" '[E]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible.  [Citations.]  An explanation of the basis for the witness's fear is likewise relevant to her [or his] credibility and is well within the discretion of the trial court.  [Citations.]'  [Citations.] Moreover, evidence of a 'third party' threat may bear on the credibility of the witness, whether or not the threat is directly linked to the defendant.  [Citations.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.)

"Just as the fact a witness expects to receive something in exchange for testimony may be considered in evaluating his or her credibility [citation], the fact a witness is testifying despite fear of recrimination is important to fully evaluating his or her credibility.  For this purpose, it matters not the source of the threat.  It could come from a friend of the defendant, or it could come from a stranger who merely approves of the defendant's conduct or disapproves of the victim. . . .  [¶]  Regardless of its source, the jury would be entitled to evaluate the witness's testimony *knowing* it was given under such circumstances.  And they would be entitled to know not just that the witness was afraid, but also, within the limits of Evidence Code section 352, those facts which would enable them to evaluate the witness's fear.  A witness who expresses fear of testifying because he is afraid of being shunned by a rich uncle who disapproves of lawyers would have to be evaluated quite differently than one whose fear of testifying is based upon bullets having been fired into her house the night before the trial." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368-1369.)

Defendant asserts the trial court acted arbitrarily and capriciously "in permitting the evidence of the drive-by shooting in at least three distinct ways:" by failing to declare a mistrial following the prosecutor's opening argument, by permitting the prosecutor to elicit from [L.S.] that he believed Hun was responsible for the shooting, and by allowing the prosecutor to argue in closing that the drive-by shooting represented a tool used by defendant and KZT to intimidate witnesses against them.

Defendant makes these arguments in a section titled "The Court Abused Its Discretion By Admitting Evidence Of A Drive-By Shooting Unconnected With David Saechao And That Error Rendered Mr. Saechao's Trial Fundamentally Unfair And Violative of Due Process." To the extent defendant is asserting the prosecutor committed misconduct, his failure to set forth argument in a separate heading forfeits the contention on appeal. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4.)

The driveby shooting was relevant to the two victims' credibility, a particularly important issue in a case where both victims gave testimony minimizing defendant's actions, contrary to statements each victim made to law enforcement in a 911 call and in text messages with defendant. Any potential prejudice was minimized by the two instructions the trial court gave to the jury, both of which informed them that they could use the driveby shooting only as to credibility and not as evidence against defendant. It was not an abuse of discretion for the trial court to admit the evidence.

Even if we were to consider prosecutorial misconduct claims they would fail. Defendant did not object to the closing argument, forfeiting any claim of misconduct. (*People v. Panah* (2005) 35 Cal.4th 395, 462.) While defendant did object to the opening statement and the question asking L.M. who he thought committed the shooting, any possible prejudice in these instances and in the closing argument was cured by the instructions limiting the driveby shooting evidence to assessing witness credibility,

15

instructions we presume the jury followed. (*People v. Edwards* (2013) 57 Cal.4th 658, 764.)

Since the evidence was properly admitted, defendant's due process claim fails as well. (See *People v. Harris* (2005) 37 Cal.4th 310, 336 ["the application of ordinary rules of evidence does not implicate the federal Constitution"].)

## II

Defendant contends the trial court prejudicially erred in permitting the gang expert to opine that defendant committed the July 5 assault on L.S. and intimidation of M.S. for the benefit of the KZT gang.

A.

While questioning the gang expert, Officer Hasegawa, the prosecutor asked:

"Based upon on all the—all of your personal involvements in this case, the evidence that's come out in this case; and everything in your past experience that you've talked about with KZT, let me ask you sir, in regards to the assault that David Saechao committed on July 4th and 5th with [L.S.], with the glass bottle, was that crime committed for the benefit of the KZT street gang?" Defense counsel's objection was overruled. Officer Hasegawa replied in the affirmative, and explained that defendant's actions were consistent with the "KZT gangster mentality" of responding to perceived disrespect with violence, even if a family member is the target of the violence. Doing so sends a message that there are severe consequences for disrespecting the gang.

Officer Hasegawa also opined, this time without objection, that the text message where defendant said, "It's just business. You can't go around do people wrong and . . . expect every[one] to be cool," played into his opinion that the assault was committed for the benefit of the KZT gang. According to Officer Hasegawa, this references to the rules of KZT on the streets that disrespect must be responded to with violence.

16

The prosecution soon asked whether the assault committed by defendant and Hun on July 4th and 5th was committed for the benefit of KZT. Defendant objected on the ground that the question assumed facts not in evidence. After a sidebar, the trial court sustained the objection.

Shortly thereafter, the prosecutor asked when defendant caused injuries to L.S. on July 4th and 5th, was this "done for the benefit of the KZT criminal street gang?" Officer Hasegawa answered, "[y]es," basing his opinion on the same reason for which breaking the bottle over L.S.'s head benefitted KZT. Defendant's objection was overruled, but the court would allow counsel to put the objection more thoroughly on the record at the break.

When the prosecutor next asked whether Officer Hasegawa had an opinion on whether Hun stabbed L.S. for the benefit of KZT, defendant objected on facts not in evidence grounds. The objection was overruled after a sidebar. Officer Hasegawa opined Hun committed the stabbing to benefit KZT based on the severity of the act and Hun showing that you cannot disrespect another KZT member.

The prosecutor followed this by asking whether the threatening call and texts to M.S. were committed for the benefit of KZT. Officer Hasegawa answered without objection that the threats were intended to benefit KZT, as intimidating witnesses and people in general was part of KZT gang culture. According to the officer, respect and fear are what the gang members want.

Officer Hasegawa also opined, without objection, that defendant possessed marijuana for the benefit of KZT.

At the next break, the trial court asked counsel if he wished "to put your objection more fully on the record." Counsel did, and explained as follows:

"With regard to the question about the breaking of the bottle, I think that was an improper hypothetical based on the evidence that's been presented. The only—the person who provided the information to law enforcement was [L.S.] And we don't have

17

any admissible evidence or testimony about that because he's not here. And so I think you've got too many degrees of inferences and other situations to make that link. And to use that as a hypothetical, I think, was improper because it's not based on the evidence."

At the time of this exchange, L.S. had not yet testified as he was still in Oregon. The trial court said that it thought the prosecutor had not asked about breaking the bottle. The prosecutor responded that he did ask about breaking the bottle in his first hypothetical, which defendant objected to. The court replied that it had sustained this objection. The prosecutor then stated his basis for assuming the broken bottle were the injuries to L.S. and the broken glass in the area where blood was found.

The trial court stated defense counsel was correct that the evidence was limited as to who broke the bottle, but the officer was entitled to rely on things not necessarily in evidence to form his opinion. The trial court "sustained the objection on a variety of different grounds, one of which was insufficient evidence on the record to support the question or facts not in evidence." However, "when the officer threw that out there as one of the pieces he used to form his opinion, he's permitted to do that." The court summarized its ruling as the prosecutor "can only ask a question when there's sufficient evidence on the record, all right, to support it," but the officer as an expert "can rely on facts that are not part of the record and not even part of the case at all." This is why the court "overruled that particular objection, because the officer offered it up himself and not in response to that particular question."

The prosecutor then noted that the texts between M.S. and defendant referring to cracking someone's head open supported the question. The court agreed, and reiterated that "when you're giving a hypothetical to an expert, you need to only refer to specific facts on the record that the jury can consider for their truth." Since this was different from what an expert could rely on, "it just depends on the way you phrase the question." The trial court stated it had sustained the one objection to the prosecutor's questioning based on the way the question was phrased, while for those questions the court did not

18

think were objectionable, the prosecutor "threaded the needle appropriately," causing the court to overrule the objection.

The trial court then told counsel there was another question where his objection was overruled. Counsel agreed, the "question on whether [] Hun stabbed [L.S.] And there was insufficient evidence that [] Hun was the person who stabbed [L.S.]" The prosecutor, the trial court, and defense counsel then discussed the possible evidentiary basis for this question. The trial court next asked if there was anything further. When counsel responded there was not, the jury was called back, and Officer Hasegawa was cross-examined.

B.

Defendant contends the trial court prejudicially erred in allowing Officer Hasegawa to testify whether defendant committed crimes for a gang purpose. Acknowledging an expert may testify as to whether under hypothetical facts someone would act for a gang purpose, defendant argues the prosecutor here "made no effort to couch his questions in terms of hypothetical suspects or persons to Officer Hasegawa, and thus Officer Hasegawa's answers offered his opinion that David Saechao was not only guilty of the crimes charged but further it was true he committed the crimes for a gang purpose." He concludes that it was reasonably likely the jury would have reached a more favorable result had the improper questioning not been allowed.

In response to a hypothetical based on the evidence presented, it is proper for a gang expert to testify that the hypothetical incident is a gang-motivated attack. (*People v. Vang* (2011) 52 Cal.4th 1038, 1043, 1045; *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512-1514.) But an expert may not testify that the defendant committed the charged offense for gang purposes. (*Vang,* at p. 1048; *People v. Ewing* (2016) 244 Cal.App.4th 359, 382 (*Ewing*).) "[T]he reason for the rule is similar to the reason expert testimony regarding the defendant's guilt in general is improper. 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not

19

because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' [Citations.]" (*Vang*, at p. 1048.)

While counsel objected to most of the prosecutor's questions related to whether Officer Hasegawa thought the crimes were committed for a gang purpose, no objection was raised on the ground asserted by defendant on appeal. The questioning, objections, and the sidebar on the objections all show that defense counsel objected to the questions not because they were not in hypothetical format but because they assumed facts not in evidence.

It is well-settled that a defendant's failure to make a timely and specific objection on the ground asserted on appeal makes that ground not cognizable. (*People v. Partida* (2005) 37 Cal.4th 428, 434; see also Evid. Code, § 353, subd. (a) [a verdict shall not be set aside for the erroneous admission of evidence unless an objection was timely made "and so stated as to make clear the specific ground of the objection"].) This is particularly true in the situation presented here, where an objection on the specific grounds argued by defendant on appeal would have allowed the trial court to cure any possible prejudice from the improper questioning. For example, in *Ewing*, while the trial court erred in allowing an expert to answer whether the defendant committed the crime for gang purposes, the error was harmless because, before asking the improper question, "the prosecutor first posed a lengthy hypothetical tracking the evidence presented during trial" and asked the expert "whether, in his opinion, the hypothetical crimes were committed in association with or for the benefit of the Norteño street gang." (*Ewing, supra*, 244 Cal.App.4th at p. 383.) Had defendant objected on the ground that the expert was asked to give an opinion on a question of guilt, then the trial court could have admonished the jury that it only could decide whether defendant was guilty of the

charged crimes and whether any of the enhancement allegations were true, and could have required the prosecutor to rephrase his questions in the form of hypotheticals based on facts tracking the evidence presented in the case.[5]  Accordingly, we conclude defendant's contention is forfeited.

III

Defendant contends, and the Attorney General agrees, that recently enacted Senate Bill No. 136, which limits the prior offenses that qualify for a prior prison term enhancement, applies retroactively to his case.  We agree.

On October 8, 2019, the Governor signed Senate Bill No. 136, which amended Penal Code section 667.5, effective January 1, 2020.  (Stats. 2019, ch. 590, § 1.)  Senate Bill No. 136 narrowed eligibility for the one-year prior prison term enhancement to those who have served a prior prison sentence for a sexually violent offense.

Defendant's prior prison terms at was not for a sexually violent offense.  (See Welf. & Inst. Code, § 6600, subd. (b) [defining sexually violent offense].)  Defendant is therefore entitled to the ameliorative benefit of the statute if Senate Bill No. 136 is applied retroactively.  We agree with the parties that the amendment to Senate Bill No. 136 should be applied retroactively in this case.

---

[5]  This likely result from a timely and specific objection also negates the prejudice necessary to sustain a contention that trial counsel was ineffective in failing to object on the ground asserted by defendant on appeal.  (See *People v. Mickel* (2016) 2 Cal.5th 181, 198 [the defendant claiming ineffective assistance on appeal has burden of affirmatively proving prejudice].)  Although neither party addressed forfeiture of this issue on appeal, whether a contention is forfeited is always at issue, so a petition for rehearing for an opportunity to address the forfeiture issue or trial counsel's alleged ineffectiveness in failing to preserve the issue will be rejected.

21

Generally speaking, new criminal legislation is presumed to apply prospectively unless the statute expressly declares a contrary intent.  (§ 3.)  However, where the Legislature has reduced punishment for criminal conduct, an inference arises under *In re Estrada* (1965) 63 Cal.2d 740, " 'that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' [Citations.]" (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.)  "A new law mitigates or lessens punishment when it either mandates reduction of a sentence or grants a trial court the discretion to do so.  [Citation.]" (*People v. Hurlic* (2018) 25 Cal.App.5th 50, 56.)

Senate Bill No. 136 narrowed who was eligible for a Penal Code section 667.5, subdivision (b) prior prison term enhancement.  There is nothing in the bill or its associated legislative history that indicates an intent that the court not apply this amendment to all individuals whose sentences are not yet final.  Under these circumstances, we find that *Estrada*'s inference of retroactive application applies.  (Accord, *People v. Lopez* (2019) 42 Cal.App.5th 337, 340-342 [Sen. Bill No. 136 applies retroactively to cases not yet final on appeal]; *People v. Jennings* (2019) 42 Cal.App.5th 664, 680-682 [same].)  Accordingly, the prison prior shall be stricken.  Since the trial court already imposed the maximum possible term, remand for resentencing is unnecessary.

DISPOSITION

The judgment is modified to strike the prior prison term enhancement.  As modified, the judgment is affirmed.  The trial court is directed to prepare a modified abstract of judgment reflecting the modified judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


          /s/
BLEASE, Acting P. J.


We concur:


     /s/
HULL, J.


     /s/
MAURO, J.

23